UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MASSACHUSETTS

C.A. No. 03-CV-12314-WGY

**Barbara C. Johnson, Esq.**
Plaintiff

v.

**Board of Bar Overseers of Massachusetts,**
**M. Ellen Carpenter, Esq.,** in her individual and professional capacities,
    including her capacity as Chair of the Board of Bar Overseers,
**Herbert P. Phillips, Esq.,** in his individual and professional capacities,
**Office of Bar Counsel,**
**Daniel Crane, Esq.,** in his individual and professional capacities,
**Commonwealth of Massachusetts,**
                    Defendants
-------------------------------------------------------------------------------------

## PLAINTIFF'S BRIEF ASSERTING THAT NEITHER QUASI-JUDICIAL NOR QUASI-PROSECUTORIAL IMMUNITY IS APPLICABLE

Now comes Plaintiff Barbara C. Johnson ["Johnson"] and submits this brief to assert that

neither quasi-judicial nor quasi-prosecutorial immunity is available to M. Ellen Carpenter, Herbert

P. Phillips, and Daniel Crane **in their individual capacities** in this action.

This brief is in three parts and presents seven issues. Part I deals with the state of the law

on immunity for government officials, including the judiciary, in article V of the Declaration of

Rights of the Constitution of the Commonwealth of Massachusetts , Massachusetts common law,

and the Supreme Judicial Court Rule 4:01, §9(3). Johnson's contention is:

1. There is no justification for "[t]he Board, members of the Board and its staff, members
   of hearing committees, special hearing officers, and the bar counsel and members of his
   or her staff" to be given absolute immunity at all times, and thus be treated differently
   than all other quasi-governmental appointees in the Commonwealth.

Part II addresses "Who Defendants Carpenter, Phillips, and Crane Are." Johnson's contentions

are:

2. Defendant M. Ellen Carpenter is not entitled to either absolute or qualified immunity
   derived from any source – whether constitutional, common law, or SJC Rule 4:01,
   §9(3).

3. Defendant Herbert P. Phillips is not entitled to either absolute or qualified immunity de-
rived from any source – whether constitutional, common law, or SJC Rule 4:01, §9(3).

4. Where Defendant Daniel Crane's function was ministerial and where he conspired to
and did deprive Johnson of her constitutional rights  -- her clearly established First
Amendments rights to political expression and free speech, the right to defend herself,
as well as well as her rights to due process and equal protection  -- Crane is not entitled
to immunity derived from any source or of any kind.

Part III, entitled "The Lack of Conscience of the Star Chamber and Public Policy," deals with the

history of judicial immunity, beginning with its rise from the Star Chamber:

5. Where **(a)** judicial immunity arose out of a case of conspiracy decided in the Star
Chamber in 1607, at the height of the abuse and misuse of judicial power, **(b)** our Fore-
fathers left England, fought a revolution, and wrote a Constitution to free themselves of
abusive medieval English legal practices, and **(c)** no legislature in a U.S. capitol or in
the Commonwealth of Massachusetts ratified the doctrine of immunity in any form,
there is *no* valid reason to deprive plaintiff of her rights under the Declaration of Rights
of the Constitution of the Commonwealth of Massachusetts  on the basis of judicial
immunity.

6. To deem judges or quasi-judges not persons subject to federal civil rights statutes is
contrary to Congressional intent, and would be repugnant to desirable public policy.
And where Defendants Carpenter and Phillips, outside their own Board Rules, violated
Johnson's constitutional civil rights, her rights to due process and equal protection, and
acted contrary to public policy, the defense of immunity is not available to them, mak-
ing dismissal inappropriate.

7. Where "the central purpose of § 1983 is to 'give a remedy to parties deprived of consti-
tutional rights, privileges and immunities by an official's abuse of his position, to ex-
tend absolute immunity to any group of state officials is to negate *pro tan*to the very
remedy which it appears Congress sought to create.  Therefore, it would make the grant
of absolute quasi-prosecutorial immunity inappropriate.

## PART I:  A COMPARISON OF THE STATUS OF THE LAW OF IMMUNITY IN MASSACHUSETTS

1. **There is no justification for "[t]he Board, members of the Board and its staff, mem-
bers of hearing committees, special hearing officers, and the bar counsel and members
of his or her staff" to be given absolute immunity at all times, and thus be treated dif-
ferently than all other quasi-governmental appointees in the Commonwealth.**

**Article V of the Massachusetts Declaration of Rights** explicitly guarantees that all mag-

istrates and officers of each branch of government be **accountable** at all times to the people, of

whom Johnson is one:\[1]/

> All power residing originally in the people, and being derived from them, the several magistrates and officers of government, vested with authority, whether legislative, executive, or judicial, are their substitutes and agents, and are at all times accountable to them.

Constitution of the Commonwealth of Massachusetts, Part the First, art. V, ratified on 16 June 1780, a little more than fourteen years before the first 10 amendments to the U.S. Constitution were ratified by Massachusetts.

Never has article V been amended.  Never has article V been repealed.  Never has the word "accountable" as used in article V been interpreted by a Massachusetts court.  Never has the Massachusetts Supreme Judicial Court analyzed the confluence of article V and the judicially-created doctrine of judicial immunity.  Never has the impact of the doctrine of judicial immunity on article V been considered and determined by a Massachusetts court.

**Massachusetts Common Law:**  The Massachusetts judiciary hopped on board the judicial-immunity bandwagon when no one was looking, when no one was paying attention to the Commonwealth's fine constitution.  The first Massachusetts judicial-immunity case to be heard in a federal court was Randall v. Bingham, 74 U.S. (7 Wall.) 523 (1868).  It is discussed in Issue #5, *infra* at 19.   The judicially-created doctrine giving all judges absolute immunity remains unchecked in Massachusetts, because there still is no entity sufficiently courageous to steer the bandwagon back onto the constitutional track as mandated by article V of the Declaration of Rights.

On the other hand, Massachusetts courts have allowed the governed some leeway in obtaining relief against other public employees:

---

[1]       It does not distinguish between the Commonwealth of Massachusetts or the individuals in their individual or official capacities.   The article constitutes the state's express and unequivocal consent to suit by the people.

Apart from judicial immunity, Massachusetts law does not recognize any absolute common-law immunity for public employees.  Duarte v. Healy, 405 Mass. 43, 46 (1989).  *See* Breault v. Chairman of the Board of Fire Commissioners of Springfield, 401 Mass. 26 (1987).  Massachusetts law does recognize qualified immunity patterned after the federal qualified immunity under 42 U.S.C. § 1983, but that immunity applies only to discretionary functions, **not ministerial acts**.  Duarte v. Healy, 405 Mass. at 46.  See also Cady v. Marcella, 49 Mass.App.Ct. 334, 339 (2000).  **Discretionary functions are limited to "discretionary conduct that involves policy making or planning**."  Harry Stoller & Co. v. Lowell, 412 Mass. 139, 141 (1992).  As the Supreme Judicial Act has explained, "[G]overnmental immunity does not result automatically just because the governmental actor had discretion.  Discretionary actions and decisions that warrant immunity must be based on considerations of public policy."  Id. at 143.  Consequently, many decisions made by public employees that we commonly recognize to involve the exercise of discretion, such as whether to remove a drunken motorist from the roadway, how to treat a patient in an emergency room, the implementation of state police disciplinary policies, and the monitoring of a probationer, have been deemed ministerial rather than discretionary for purposes of evaluating qualified immunity.  Id. at 143-144, and cases cited.

Doe ex rel. Doe v. Yunits, 2001 WL 664947 * 2,  No. 00-1060A (Mass.Super. Feb. 26, 2001)

(Gants, J.) (emphasis supplied).  In sum, under Massachusetts common law, there is qualified immunity for very limited discretionary functions, and there is no immunity for ministerial functions.

**SJC Rule 4:01, §9(3).**   Section 9(3) reads, **"**The Board, members of the Board and its staff, members of hearing committees, special hearing officers, and the bar counsel and members of his or her staff shall be immune from liability for any conduct in the course of their official duties."  This  rule throws accountability out the window.  As Johnson's Amended Complaint makes clear, the individuals in the class protected by §9(3) have been brazenly acting with impunity and have been depriving the class of Massachusetts licensed attorneys, of which Johnson is one, the full sweep of constitutional rights to due process and equal protection.  There is no rationale justification or legal basis for this deprivation.  Regulatory goals can be met in Article III courts.[2]/  If people have a problem with an attorney, they can sue that attorney in a court created for the general public.  Using a titular plaintiff, such as Daniel Crane ["Crane"], who has no personal knowl-

---

[2]     Federal courts derive authority from Article III of the U. S. Constitution.  The Commonwealth's courts are erected out of Article III of Ch. 1, Sec. 1, of the Constitution of the Commonwealth of Massachusetts.

edge of the facts in the case, denying discovery of the complainant(s), precluding a respondent at-torney, such as Johnson, the opportunity to call witnesses and/or to cross-examine her accusers . . . all are overwhelming deprivations, deprivations that cause not one scintilla of fundamental fair-ness to enter the arena of a disciplinary action brought at the BBO. There is nothing about the OBC/BBO's disciplinary action that smacks of juridical process. That the OBC/BBO individuals should then be given absolute immunity that applies to duly-appointed judges cannot and should not be tolerated. In the disciplinary action, these defendants knowingly, voluntarily, intelligently, and conspiratorially acted outside the Board of Bar Rules. They did so, to deprive Johnson (and many others) unlawfully of the full sweep of her rights to due process and the equal protection of the law. Any kind of immunity in such a context would be an anathema to any reasonable and ra-tional public policy.

## PART II: WHO DEFENDANTS CARPENTER, PHILLIPS, AND CRANE ARE

**2.    Defendant M. Ellen Carpenter is not entitled to either absolute or qualified immunity derived from any source – whether constitutional, common law, or SJC Rule 4:01, §9(3).**

Defendant M. Ellen Carpenter is Chair of the Board of Bar Overseers ["BBO"] [Compl. ¶3]. Under SJC Rule 4:01, §9(3), Carpenter has absolute immunity. The constitutionality of that provision was challenged in Count 4 in the instant action [Compl. ¶¶245-253], a count which has been dismissed. Notwithstanding, however, that count not being presently before this court, the duly-ratified article V of the Declaration of Rights of the State constitution preempts §9(3).

In Defendants' Further Motion to Dismiss, filed after the Order issued giving the parties the option of filing a brief on quasi-judicial and quasi-prosecutorial immunity, the defendants contend that Carpenter is entitled to "absolute immunity" in her "quasi-judicial capacit[y]" as an "adminis-trative[] adjudicat[or]." They do not state the source of the "absolute immunity" to which they make claim. That is, they are silent as to whether "their" absolute immunity is an outgrowth of the

judicially-created doctrine of judicial immunity or whether its source is §9(3).

Johnson contends that article V's guarantee of accountability trumps the judicially-created-immunity card regardless of its source.

Assuming *arguendo* that common-law is applicable, a description of Carpenter's function(s) is in order, to determine whether absolute, qualified, or no immunity whatsoever is appropriate.   In actual fact, Defendant Carpenter was, at most, but a "**shadow judge**": Carpenter was not appointed pursuant to Board Rule 3.19(a) as a member of a hearing panel or as a special hearing officer.  Defendant Herbert P. Phillips was the individual appointed to be the Special Hearing Officer [Compl. ¶4].  Carpenter had under the Board Rules authority to decide only dispositive motions brought by a defending attorney\\[3]/ [Compl. ¶80].   Even then, Carpenter never having allowed oral argument on any motion that she was to decide, she never met Johnson.  In fact, she and Johnson were never in a room alone or with others present.

Although unhappy with Carpenter's decisions on her motions to dismiss, Johnson did **not** complain of Carpenter's consistent denials of them, for Carpenter did, indeed, have the authority under Board Rule 3.18(b)(1) to make those decisions.  Johnson complained only and vigorously of Carpenter's decisions that were not within her authority to make [Compl., including but not limited to the paragraphs in note 4 in the margin].\\[4]/

Carpenter disregarded the Board Rules' division of responsibility as to dispositive and nondispositive motions [Compl. ¶¶69-71].   By deciding motions that according to the BBO rules, others were to decide, Carpenter acted outside her limited authority to "adjudicate" dispositive motions and did thereby usurp powers or obligations reserved for other Board members and the non-

---

[3]       Whether the division of responsibility as to dispositive and nondispositive motions [Compl. ¶¶69-71] occurs in the other 49 State "Boards of Bar Overseers" is unknown.  Whether the constitutionality of the division of responsibility has been tested is unknown.  Whether they have "shadow judges" is unknown.

[4]       ¶¶ 51, 53-58. 66, 69, 71, 97-98, 103-105, 109, 111, 114-116, 190-192, 238, 242-243, 276, 284, 288-291, note 2, and the related exhibits, called out in the respective paragraphs.

Board hearing officer [Compl. ¶¶71, 114, 190-192].

Carpenter was a shadow judge. She was **not** a member of a hearing panel. Nor was she the special hearing officer appointed pursuant to Board Rule 3.19(a). As such, Carpenter is <u>not</u> entitled to immunity under the common-law judicially-created doctrine of judicial or quasi-judicial immunity. *See* <u>Bradley v. Fisher,</u> 80 U.S. (13 Wall.) 335, 347 (1871).

As stated above, the source of Carpenter's immunity defense is purportedly based upon SJC Rule 4:01, §9(3), but that rule provides her "immunity from liability for any conduct in the course of [her] **official** duties." Section 9(3) (emphasis supplied). Her decisions on motions for so-called protective orders and impoundment and preclusion and trial by jury were decisions on **non**dispositive motions and were thus outside the scope of her duties as defined in the Board Rules. [Compl. ¶¶51, 54-55, 57-58, 71, 97-98, 100-101, 103, 109-110, 114-115, 190-192, 238, 242-243].

Also in their Further Motion to Dismiss, the defendants contend that Carpenter and Phillips were to "administratively adjudicate the merits of the Petition for Discipline." That, too, is untrue: It was not the role of either Phillips or Carpenter to adjudicate the merits of the disciplinary action after the formal hearing:

- Phillips was to hear and decide **non**dispositive motions [<u>Board Rule 3.18(a)</u>],

- Carpenter or a designee was to decide **only** those dispositive motions filed by the defending attorney, namely, Johnson [<u>Board Rule 3.18(b)(1)</u>],

- Phillips was to report promptly to the **Board** his findings, conclusions, and recommendations, together with a record of the proceedings before him [<u>Board Rule 3.46</u>].

Where Carpenter acted outside the scope of her authority, §9(3) does not apply. Of course, §9(3) of SJC Rule 4:01 is also violative of article V of the Declaration of Rights of the Constitution of the Commonwealth of Massachusetts, which guarantees accountability to the people at all times by all officers of the three branches of State government.

Moreover, in keeping with the Fourteenth Amendment and the cases holding that where a party has been intentionally deprived of constitutional rights, there is no immunity.\5/,\6/,\7/  <u>Hafer v. Melo</u>, 502 U.S. 21, 28 (1991) (in 1871, Congress enacted §1983 "to enforce provisions of the Fourteenth Amendment against those who carry a badge of authority of a State and represent it in some capacity, whether they act in accordance with their authority or misuse it"), quoting <u>Scheuer v. Rhodes</u>, 416  U.S. 232, 243 (1974), quoting <u>Monroe v. Pape</u>, 365 U.S. 167, 171-172 (1961), and citing <u>Lugar v.  Edmondson Oil Co.</u>, 457 U.S. 922 (1982).  Congress has also intended that judges would be accountable and thus not immune from suit. *See* <u>Pierson v. Ray</u>, 386 U.S. 547, 563-567 (1967) (Douglas, J., dissenting), for the legislative history of §1983.

In terms of power, there is "no difference between imposing liability on a state police officer (<u>Monroe v.Pape</u>, *supra*) and on a state judge. The question presented is not of constitutional dimension; it is solely a question of statutory interpretation."  <u>Pierson</u>, at 564-566 (Douglas, J., dissenting).

Thus, where Carpenter intentionally deprived Johnson of her constitutional rights to due process and equal protection, even the judicially-created immunity is not available to Carpenter as

---

[5]    *Cf.* <u>Hopper v. Callahan</u>, 408 Mass. 621, 635 n. 8 (1990)  ("there is substantial doubt that either of the two State statutes we have discussed would be effective to grant immunity against a §1983 claim based on the deprivation of due process rights protected by the Fourteenth Amendment"), citing <u>Martinez v. California</u>, 444 U.S. 277, 284 & n. 8 (1980).

[6]    Having been approved by Congress in 1866 and completely ratified in 1868, the Fourteenth Amendment was passed to provide people with the rights to due process and equal protection: It reserved the right of citizens and noncitizens alike to sue a State if a federal question was raised in the suit: that is, federal-question cases are not touched by the Eleventh Amendment.  The Court in <u>Scheuer</u>, 416 U.S. at 237, reaffirmed by noting that since <u>Ex parte Young</u>, 209 U.S. 123, in 1908, "'it has been settled that the Eleventh Amendment provides no shield for a state official confronted by a claim that he had deprived another of a federal right under the color of state law.'"

[7]    Section 1983 should be "liberally and beneficently construed ... [and] be broadly construed against all forms of official violation of federally protected rights."  <u>Monell v. New York City Dept. of Social Services</u>, 436 U.S. 658, 684, 700-701 (1978), quoted in <u>Dennis v. Higgins</u>, 498 U.S. 439 (1991).

<u>Langton v. Secretary of Public Safety</u>, 37 Mass.App.Ct. 15, 19 (1994).

a defense to Counts 7, 8, and 9.   And where §9(3) of SJC Rule 4:01 is not derived from a federal

or state constitution, not derived from a federal or state statute, and not derived from common law,

§9(3) has no legal force or authority to override the rights guaranteed Johnson by the Fifth and

Fourteenth Amendments of the United States Constitution and enforced by §1983.

**3.     Defendant Herbert P. Phillips is not entitled to either absolute or qualified immunity derived from any source – whether constitutional, common law, or SJC Rule 4:01, §9(3).**

Defendant Herbert P. Phillips was appointed, purportedly pursuant to Board Rule 3.19(a),

as the special hearing officer  ["SHO"] on Crane's disciplinary action against Johnson.[8]/  Like

Carpenter, Phillips seeks absolute quasi-judicial immunity for his role as an administrative adjudi-

cator, and the source of his immunity defense is also SJC Rule 4:01, §9(3).  Johnson incorporates

herein this issue by reference the arguments in Issues ##1 and 2, *supra*.

Although Phillips alleges that he is performing a quasi-judicial function, he is not doing it

independently or fully.  "Shadow Judge" Carpenter has made decisions on both dispositive and

nondispositive motions [Comp. ¶¶69-71].   Assistant BBO General Counsel Carol Wagner was

ever-present at Phillips' side at the "bench."  She was, literally, physically prodding and whisper-

ing to him during pretrial and trial proceedings [Compl. ¶¶33, 285].  When questioned by Johnson

during one hearing, Wagner admitted she was advising and counselling him as to how to perform

his temporary job as a quasi-administrative judge [Compl. ¶¶185, 238, 285, 287].

Where Phillips deprived Johnson of her constitutional rights to due process and equal pro-

tection,[9]/ §9(3) does not apply and immunity is not available to Phillips as a defense to Counts 7,

---

[8]     Phillips' qualifications are unknown, other than those revealed on his and the BBO's websites. Phillips' website reveals he is primarily a tax attorney in private practice with two other attorneys in Haver-hill, Massachusetts.  The BBO's website gives his office address and the year of his admission to the Bar. Phillips, himself, told attendees that he is 72 years of age and that his wife winters in Florida.

[9]     The paragraphs that describe how Phillips deprived Johnson of her constitutional rights to due pro-cess and equal protection include but are not limited to ¶¶48, 61, 79, 125, 127-141, 143-150, 164, 175, 179, 185-187, 193-195, 238, 274, 287.

8, and 9.   Section 9(3) does not override the rights guaranteed Johnson by the Fifth and Fourteenth

Amendments to the U.S. Constitution and enforced by §1983.   And, of course, §9(3) does not pre-

empt article V of the Massachusetts Declaration of Rights.

**4.** **Where Defendant Daniel Crane's function was ministerial and where he conspired to and did deprive Johnson of her constitutional rights  -- her clearly established First Amendments rights to political expression and free speech, the right to defend herself, as well as her rights to due process and equal protection  -- Crane is not entitled to immunity derived from any source or of any kind.**

Defendant Crane is both Bar Counsel and the plaintiff in the disciplinary action.    He was

appointed as Bar Counsel by the BBO, and is serving both at the pleasure and approval of the SJC

[SJC Rule 4:01, §5(3)(b)].   (Section 5(3)(b) is ambiguous as to whether he is employed and com-

pensated by the BBO as are such other people identified in the rule.)  By the silence -- i.e., the ab-

sence of a rule or section of a rule **(a)** identifying the entity to be named as Plaintiff in a discipli-

nary action or **(b)** commanding Bar Counsel Crane to be the Plaintiff in the disciplinary action -- it

is reasonable to infer or conclude that SJC Rule 4:01 and the BBO rules imply that Crane volun-

teered to be Plaintiff on behalf of the alleged complainants in the disciplinary action.

In an Article III court, the absence of a reference of appointment precludes protection of

quasi-judicial immunity on the voluntary actor.

A court-appointed attorney, unlike a guardian ad litem or conservator, performs an advo-
cacy function on behalf of the party represented, not a quasi-judicial function on behalf of
the court.

Sarkisian v. Benjamin, 2000 WL 1299235 *1, No. CA995448 (Mass.Super. May 2, 2000) (Fabri-

cant, J.) (a legal malpractice case).

In his official capacity, Crane is the alter ego of the OBC,\[10]/ which is the administrative

prosecuting body.  Like Attorney Roberta Benjamin in Sarkisian, Crane, at most, can be said to be

filling an advocacy role on behalf of the alleged complainant(s).   And like Benjamin, in an Article

III court, Crane would not have immunity.   Yet, like Carpenter and Phillips, Crane seeks absolute "quasi-judicial" immunity for his role as the administrative prosecutor.  But one of his assistants, Susan Strauss-Weisberg, is acting as the quasi-prosecutor of the disciplinary action.  (She is not a defendant in this action.)

In sum, in the BBO action, Crane is merely both the titular administrative prosecutor and the titular plaintiff.   Whether it be absolute quasi-judicial or quasi-prosecutorial immunity he should seek, Crane would not be afforded absolute immunity under either category of derivative immunity.  The reason is well-settled: the nature of Crane's prosecutorial activity in the State Bar case has been strictly ministerial.  If it were administrative and closely associated with the trial process, his conduct might warrant, at most, qualified immunity.  Imbler v. Pachtman, 424 U.S. 409, 430 (1976) (certain administrative or investigative conduct might warrant only qualified immunity).

Were Crane and Strauss-Weisberg acting as administrative or trial prosecutors in the real courts of the Commonwealth, they would be in the executive branch of government and not in the judicial branch, where they find themselves in the State action.  Com. v. Gordon, 410 Mass. 498, 501  (1991) (dicta: district attorneys and their assistants are in the executive branch of government); Com. v. Super, 431 Mass. 492, 499 (2000) (same).   Given, however, that Crane and Strauss-Weisberg are employed under the auspices of the SJC, and not the governor, their classification is like that of a mutant sitting on a fence dividing the judicial and executive branches. Given, however, that it is the nature of their function which is the basis of this analysis, this court may conclude that Crane's function is quasi-prosecutorial and not quasi-judicial in nature. Chicopee Lions Club v. District Attorney for the Hampden Dist., 396 Mass. 244, 248 (1985) ("the scope of immunity depends not merely on the status or title of the public official, but on the nature

---

[10]    The OBC is an independent body created by the SJC for attorney disciplinary purposes [Compl. ¶5].

of the official behavior challenged").

Notwithstanding the mutancy of the birth of Crane's function, he is a so-called "public of-
ficial" in an independent body born of the judicial branch.  His role as titular plaintiff[11]/ in the
disciplinary action appears to be, at most, ministerial in nature.   A ministerial role does not suffice
to trigger protection under the umbrella of generic immunity.   Breault v. Chairman of the Bd. of
Fire Commrs. of Springfield, 401 Mass. 26, 38 (1987), *cert. denied sub nom*. Forastiere v. Breault,
485 U.S. 906 (1988) (holding, "where intentional ministerial acts of public officials are involved,
there is no basis to conclude, under the relevant statutes and case law, that immunity from suit
should be granted").

> The doctrine of qualified immunity shields public officials who are performing discretion-
> ary functions, **not ministerial in nature**, from civil liability in §1983 actions if at the time
> of the performance of the discretionary act, the constitutional or statutory right allegedly in-
> fringed was not "clearly established."

Laubinger v. Department of Rev., 41 Mass.App.Ct. 598, 603 (1996), quoting from Harlow v. Fitz-
gerald, 457 U.S. 800, 818  (1982) (emphasis supplied).

That statement in Laubinger leads to the question, Were Johnson's rights  "clearly estab-
lished"?  Yes, as a lawyer as well as a citizen, Johnson had a clearly established First Amendment
right to political expression and free speech on her websites, in her court pleadings, and during her
gubernatorial campaign regarding the need for court reform and accountability of the judiciary and
those appointed by it.  *See* Howcroft v. Peabody, 51 Mass.App.Ct. 573, 595 (2001) ("Howcroft's
right to speak out regarding tobacco smoke in the station house was 'clearly established' when the
defendants allegedly undertook their retaliatory actions").  *See also* Connick v. Myers, 461 U.S.
138, 147-148 (1983) (constitutional right of speaking "as a citizen upon matters of public con-
cern").  Waters v. Churchill, 511 U.S. 661, 668 (1994) ("To be protected, the speech must be on a

---

[11]      Curious is that Crane is both the plaintiff and a prosecutor in the employ of the judiciary's child,
viz, the BBO.

matter of public concern")  Pickering v. Board of Educ., 391 U.S. 563, 568 (1968) (where court

determines the speech to be on a matter of public concern, then the court must "arrive at a balance

between the interests of the [employee], as a citizen, in commenting upon matters of public con-

cern and the interest of the State, as an employer, in promoting the efficiency of the public ser-

vices it performs through its employees").  In Pickering, "the Supreme Court determined that a

letter written by a public school teacher to a newspaper attacking the school board's construction

bond issue proposals was speech on a matter of public concern."

> Perry v. Sindermann, 408 U.S. 593, 595 (1972), considered the case of a State college pro-
> fessor who testified before the Legislature that a college be elevated to four-year status, to
> same effect.  In Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle, 429 U.S. 274, 284,
> (1977), the Court reached the same conclusion in a case concerning a public school teacher
> who released to a radio station the substance of a memorandum dealing with teacher dress
> and appearance.  Givhan v. Western Line Consol. Sch.Dist., 439 U.S. 410, 414 (1979),
> concerned a teacher who complained to a school principal about school board policies and
> practices relating to racial discrimination.  The Supreme Court described these and other
> matters of "public concern" as those "dealing in some way with 'the essence of self-
> government,'  Garrison v. Louisiana, 379 U.S. 64, 74-75 (1964), matters as to which 'free
> and open debate is vital to informed decisionmaking by the electorate,'  Pickering [v.
> Board of Educ., 391 U.S. 563,] 571-572 [(1968)], and matters as to which 'debate ...
> [must] be uninhibited, robust, and wide-open,'"  Dun & Bradstreet, Inc. v. Greenmoss
> Builders, Inc., 472 U.S. 749, 755 (1985) (plurality opinion), quoting New York Times Co.
> v. Sullivan, 376 U.S. 254, 270 (1964).  **In short, speech on matters of public concern is
> that speech which lies "'at the heart of the First Amendment's protection.'"**  Rankin v.
> McPherson, 483 U.S. 378, 395 (1987) (Scalia, J., dissenting), quoting First Nat'l Bank v.
> Bellotti, 435 U.S. 765, 776 (1978).

Pereira v. Commissioner of Social Services, 432 Mass. 251, 258-259 (2000) (emphasis supplied).

Like that of Carpenter and Phillips, however, the source of the immunity implicitly in-

voked by Defendant Crane, too, is §9(3) of SJC Rule 4:01 and not common law.

That the OBC, Crane, and his minions, performing "executive" functions, share space,

telephone system, receptionist, as well as restroom keys, with the BBO, performing "judicial"

functions, gives an appearance of impropriety.

## PART III:   THE LACK OF CONSCIENCE OF THE STAR CHAMBER AND PUBLIC POLICY

5.    **Where (a) judicial immunity arose out of a case of conspiracy decided in the Star Chamber in 1607, at the height of the abuse and misuse of judicial power, (b) our Forefathers left England, fought a revolution, and wrote a Constitution to free themselves of abusive medieval English legal practices, and (c) no legislature in a U.S. capitol or in the Commonwealth of Massachusetts ratified the doctrine in any form, there is *no* valid reason to deprive plaintiff of her rights under the Declaration of Rights of the Constitution of the Commonwealth of Massachusetts on the basis of judicial immunity.**

The doctrine of judicial immunity was born in England in 1607 from the womb of a devil court, the reviled Star Chamber,\[12]/ and in the United States around 200 years later from the rib of the Star Chamber case when the Supreme Court, in Bradley v. Fisher, 80 U.S. (13 Wall.) 335, 347 (1871), usurped a legislative function in violation of the separation of powers.  Given those conditions of birth, the doctrine of judicial immunity and its progeny, the derivative "quasi" immunities, are unconstitutional and may not be applied not only to this case but to any other.

---

[12]  The Star Chamber was established after an act in 1341.  The Encyclopaedia Britannica, 11th ed. (1911), vol. XXV, p. 795.  Over time, the composition and jurisdiction of the court became uncertain, but "[i]n practice its jurisdiction was almost unlimited."  Id., citing William Hudson,  "Treatise of the Court of the Star Chamber," in vol. ii. of Collectanea Juridica.  Certainly its jurisdiction had superseded that of the ordinary courts of law in cases where the ordinary courts were too weak to act. Encyc. Brit. 11th ed., vol. XXV, p. 795.

After the act of 1487, "the Star Chamber became the great engine of the royal tyranny.  Id.  Although the court had been initially a court of appeal, Henry VIII, Chancellor Wolsey, and Archbishop of Canterbury Cranmer encouraged plaintiffs to bring their cases directly to the Star Chamber, bypassing the lower courts entirely and within 25 years of 1487, under the leadership of Wolsey and Cranmer, the Chamber not only performed the very necessary and valuable work in punishing powerful offenders who could not be reached by the ordinary courts of law [id.], it also became a political weapon for bringing actions against opponents to suppress opposition to royal policies of Henry VIII.

Originally open to the public, the Court of Star Chamber sessions came both to be held in secret and to represent the misuse and abuse of power by the king and his circle.  "Its procedure was not according to the common law."  Id.  There were no witnesses (it could proceed on rumor alone), no juries, no right of appeal, and punishment was swift, flexible, and severe to any enemy of the crown.  ("It could apply torture; it could inflict any penalty but death." Id.)

Between 1628 and 1640, the Court of Star Chamber became a substitute for Parliament.  Court of Star Chamber proceedings were used extensively to persecute dissenters, including Puritans who fled to New England, and gain not only arbitrary convictions, but also arbitrary acquittals for guilty parties whom the crown wished to protect. The abuses of the Star Chamber by Charles I were one of the rallying cries for those who eventually beheaded him in 1649.

In sum, because it "characteristically departed from common-law traditions . . . and . . . specialized in trying 'political' offenses, the Star Chamber has for centuries symbolized the disregard of basic individual rights."  Faretta v. California, 422 U.S. 806, 821 (1975).

14

With such repugnant roots, the federally-nurtured doctrine may not override the duly ratified and never amended article V of the Massachusetts Declaration of Rights. The doctrine must not be countenanced by this court, for judicial immunity inappropriately and unconstitutionally precludes the appropriate scrutiny and accountability of the courts, the BBO, the OBC, and the natural defendants in the instant case. The doctrine fosters secrecy, sloth, and unscrupulousness.

Of particular significance are **(1)** that Congress intended judges not to be immune against civil rights deprivation claims, **(2)** that article 6 of the U.S. Constitution may not be invoked, for Congress not only was not at the party at the <u>Bradley v. Fisher</u> bench but also did not have the intention to immunize judges or the Commonwealth, **(3)** that judicial immunity is violative of the Ninth Amendment of the U.S. Constitution, **(4)** that judicial immunity is against public policy, and **(5)** that it cannot bar Johnson's §1983 claims and her pendent common-law claim for defamation.

Johnson further argues that under 42 U.S.C. §1983, judges are also subject to suit both in law and at equity, as that statute explicitly provides and the Fourteenth Amendment guarantees. Although the Fourteenth Amendment has been routinely overridden by the Eleventh Amendment, it has been overridden by that prong of the amendment which was not duly ratified and which was born out of the bench without the participation of Congress, despite the contrary intention of Congress to hold judges accountable as all other government officers are when they deprive citizens of their civil rights. *See* Justice Douglas's dissent, *infra* at 22, in <u>Pierson v. Ray</u>, 386 U.S. 547.

> . . . As early as 1872, the Court recognized that it was "a general principle of the highest importance to the proper administration of justice that a judicial officer, in exercising the authority vested in him, [should] be free to act upon his own convictions, without apprehension of personal consequences to himself."

<u>Stump v Sparkman</u>, 435 U.S. 349, 355 (1978), quoting <u>Bradley v. Fisher</u>, 80 U.S. (13 Wall.) 335, 347 (1871).\[13]/ But Justice Field misstated history in <u>Bradley</u>. Judicial immunity was <u>not</u> to

---

[13] "A judge will not be deprived of immunity because the action he took was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in the 'clear absence of all jurisdiction,'" <u>Stump</u>, 435 U.S. at 356-357, quoting <u>Bradley</u>, at 351.

protect the judges for some lofty ideal – as is touted today -- it was to protect the King himself. The purpose was to avoid entrenching the King in the middle of a scandal.  Floyd and Barker, 12 Co.Rep. 23, 25, 77 Eng.Rep. 1305, 1307 (1607) (case of conspiracy).



> Note well, that the said matters done at the Bar were not examinable in the Star-Chamber; and for this it was ordered and decreed by all the Court, that the said bill without any answer to it, by the said Richard Barker, shall be taken off the file and cancelled, and utterly defaced: and it was agreed, that insomuch as the Judges of the realm have the administration of justice, under the King, to all his subjects, they ought not to be drawn into question for any supposed corruption, which extends to the annihilating of a record, or of any judicial proceedings before them, or tending to the slander of the justice of the King, which will trench to the scandal of the King himself, except it be before the King himself; for they are only to make an account to God and the King, and not to answer to any suggestion in the Star-Chamber; for this would tend to the scandal and subversion of all justice.  And those who are the most sincere, would not be free from continual calumniations, for which reason the orator said well, *invigilandum est semper, multæ insidiæ sunt bonis.*
> And the reason and cause why

**Figure 1. Allegations of corruption "will trench to the scandal of the King himself"**

Floyd and Barker was decided in the Star Chamber in 1607, when the Chamber was at its height of corruption.   Its reputation of misuse and abuse having grown, the Chamber was abolished in 1641, during the reign of King Charles I (Stuart).  Charles, a man of allegedly private virtue and public vice, "a man of blood," was found guilty of treason during the First English Civil War and beheaded on a scaffold outside the Banqueting House at Whitehall on 30 January 1649.

Not only from a moral perspective should no court in our land follow the law arising out of a judicial chamber of horrors, to follow the law of the Court of Star Chamber is more odious because we fought the Revolution to free ourselves from that tyranny and have earned the right to keep ourselves free from institutions and people who want to escape accountability and threaten our liberties.

Despite that verity, the Court in Stump, *supra*, wrote,

. . . the Court held that "judges of courts of superior or general jurisdiction are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been done maliciously or corruptly." 613 Wall., at 351.

16

Stump, 435 U.S. at 355-356.\[14]/  Not only does that proposition allow judges to be malicious and

corrupt (which meant not adhering to the law and the facts, such as was done in Johnson's case),

the statement in Stump is a bald statement of half-truth.

In England, during a period when "[a] number of courts challenged the King's Bench for

authority" [Pulliam v. Allen, 466 U.S. (Va.) 522, 530 (1984)], judicial immunity originally pro-

tected only the "higher judges of the King's courts." Id., at 531.

> But in a writ of false judgment, the plaintiff shall have a direct averment against that which
> the Judges in the Inferior Court have done as Judges, *quia recordum non habent*; and with
> this accords 21 H. 6. 34.

Floyd and Barker, 12 Co.Rep. at 24, 77 Eng.Rep. at 1307.

> . . . in Floyd and Barker, 12 Co.Rep. 23, 77 Eng.Rep. 1305 (1607), Coke and his colleagues
> of the Star Chamber had declared the judges of the King's Bench immune from prosecution
> in competing courts for their judicial acts.  In doing so, they announced the theory upon
> which the concept of judicial immunity was built.

Pulliam, 466 U.S. at 530.

.     Although the court in Pulliam iterated the history of judicial immunity, it did so ambigu-

ously.  For instance, the court in Pulliam failed to state what Barker did, what the conspiracy was

about, who the co-conspirators were, and who Floyd was.  That failure arose because of the se-

crecy that was the hallmark of the Star Chamber.  The reasonable inference that may be drawn is

that someone by the name of Floyd learned the truth of corruption and conspiracy (from the head-

ing on the case) in the court, and that corruption had to be covered up.  See Figure 2, *infra*.

---

[14]     A state official in her personal capacity is a "person" for purposes of §1983.  Hafer v. Melo, 502
U.S. 21, 31 (1991) (rejecting Will).  Personal-capacity §1983 suits against state officials in federal court,
not being barred by the Eleventh Amendment [Hafer, at 22, citing Scheuer v. Rhodes, 416 U.S. 232, 237-
238  (1974)], "state officials may [ ] be held liable in their personal capacity for actions they take in their
official capacity."  Hafer, at 27.

12 CO. REP. 25.          CASE OF CONSPIRACY          1307

the 47 Ed. 3. 15. that a Judge who hath a commission, viz. that is of record, shall not be charged in conspiracy ; which is to be understood of what he did ;

**Figure 2. A Case of Conspiracy**

So, the inescapable conclusion from Pulliam must be that the entire authority for the modern 'doctrine' of judicial immunity is based on royal prerogative and edicts emanating from the Star Chamber, which was dissolved and outlawed in 1641, and remains a blot on the landscape of England's juridical history.

In fact, Floyd and Barker reveals that William Price was indicted by a grand jury.  He pled not guilty, but was tried by a jury and convicted.  After his execution, the jurors who convicted him "were charged in the Star-Chamber for conspiracy against him, and indicted and convicted." Floyd, 12 Co. at 1306, 77 Eng.Rep. at 23.\[15]/

The report identifies Floyd only as "Rice ap Evan ap Floyd," with nothing more and notes that the suit occurred after William Price was convicted in Judge Richard Barker's court for murder and executed by the sheriff.  The reason Floyd sued Barker and others in the Star Chamber for conspiracy – at that time a cause of action allowed for diverse reasons – is not revealed.  But that is key to knowing and understanding the basis of the then-created doctrine of judicial immunity!  Did Barker commit a wrong, outside the scope of his authority? Did he violate an existing statute? Was he simply a loyalist to the Royal family and under its protection?  Or was he acting on orders

---

[15]    "There is no room for wonder at any verdict that could be returned by a jury, when we consider what means the government possessed of securing it. The sheriff returned a pannel, either according to express directions, of which we have proofs, or to what he judged himself of the crown's intention and interest. If a verdict had gone against the prosecution in a matter of moment, the jurors must have laid their account with appearing before the star-chamber; lucky, if they should escape, on humble retraction, with sharp words, instead of enormous fines and indefinite imprisonment.'"

Cohen v. Hurley, 366 U.S. 117, 139 n. 16 (1961) (dissenting note), quoting Hallam, *The Constitutional History of England*, Vol. I (2d ed.), at 316 n. 15 for the proposition that juries then were controlled by the King's men.

from the King, the chancellors, or the justices of the Chamber?

The ruling chief justices, Popham and Coke (after whom Coke's King's Bench Reports are named), did not convict Barker. Instead, they established judicial immunity for the King's judges. Their rationale was that if the judges were convicted it would "trench to the scandal of the King himself." Floyd, 12 Co. at 1307, 77 Eng.Rep. at 25.

Despite the new declaration of judicial immunity, the Floyd report includes two declarations of judicial corruption: ". . . in truth the whole set of Judges were then so corrupt that the King was forced to try [Judge Thorp] by commission." Id. And the other:

> . . . Thomas Weyland, Chief Justice of the Common Bench, Sir Ralph Hengham, Justice of the King's Bench; and the other justices, were accused of bribery and corruption; and their causes were determined in Parliament, where some were banished, and some were fined and imprisoned.

Floyd, 12 Co. at 1308, 77 Eng.Rep. at 25.

The facts on which the judges were convicted are also, of course, not revealed in Floyd, the report of which was written by the chief justices of the most corrupt court in English history. A few years later, the monarch was executed.

That medieval England in 1607 established judicial immunity to insulate its nobility from accountability does not highly support the continuation of that doctrine in Post-revolutionary America, it, instead, recreates the causes of the Revolution.

Floyd v. Barker reached our shores in a case involving a Massachusetts attorney. The case was Randall v. Bingham, 74 U.S. (7 Wall.) 523 (1868),[16]/ an action against a Massachusetts superior court justice for the alleged wrongful disbarment of an attorney. The Court there wrote, "[Judges] are not liable to civil actions for their judicial acts, even when such acts are in excess of their jurisdiction, **unless perhaps where the acts, in excess of jurisdiction, are done maliciously**

---

[16]        The year is variously given as 1868 or 1869.

or corruptly." Id., at 536 (emphasis supplied).\[17]/ Article V of the Declaration of Rights was not

cited.

It was in Bradley v. Fisher, supra,\[18]/ another case in which an attorney was suing a judge

for the deprivation of his right to practice as an attorney in the District of Columbia, that Mr. Jus-

tice Stephen Field, a bald-headed man with a foot of facial hair, declared on behalf of the Court, in

words for all intents and purposes meaning, "The Randall Court was wrong. Judges can be mali-

cious or corrupt. It does not matter. They must remain independent, so they should not worry

about being interfered with even when they act maliciously and corruptly."

> In Bradley, the Court illustrated the distinction between lack of jurisdiction and excess of
> jurisdiction with the following examples: if a probate judge, with jurisdiction over only
> wills and estates, should try a criminal case, he would be acting in the clear absence of ju-
> risdiction and would not be immune from liability for his action; on the other hand, if a
> judge of a criminal court should convict a defendant of a nonexistent crime, he would
> merely be acting in excess of his jurisdiction and would be immune.

Stump, 435 U.S. at 357 n. 7, citing Bradley at 352.

It is shocking to the average lawyer as well as the average layperson that the highest Court

---

[17]    In fact, in 1868, when Randall v. Bingham was decided, express malice was also not excused in
Britain as it has been in this Republic ever since Bradley. And it appears that in the British Commonwealth,
judicial immunity from charges of constitutional violations has became obsolete or has fallen into desue-
tude. The date when this occurred in the British Commonwealth is unknown to this author.

> … Chief Justice Lord Denman stated that law in Kendillon v Maltby, 174 Eng. Rep. 562, 566 (N.P.
> 1842) as follows: "I have no doubt on my mind, that a magistrate, be he the highest judge in the
> land, is answerable in damages for slanderous language, either not relevant to the cause before him
> or uttered after the cause is at an end; but for words uttered in the course of his duty, no magistrate
> is answerable, either civilly or criminally, unless express malice and absence of reasonable or prob-
> able cause be established." **Today, constitution based commonwealth countries have no judicial
> immunity for violation of Constitutional Rights**. *See The Digest of British, Commonwealth and
> European Cases*, Note 3641, "No Liability for acts done in Judicial Capacity—Unless Interference
> with Rights or Freedoms Under Constitution."

John E. Wolfgram, "How the Judiciary Stole the Right to Petition," 31 U. West L.A. L. Rev. 14 n. 28 (Sum-
mer 2000) (emphasis supplied).

[18]    Messrs. Justice Davis and Clifford dissented, writing that if a judge acts maliciously and corruptly,
he is, in their opinion, "subject to suit the same as a private person would be under like circumstances."
Bradley, at 357.

of our land should find it acceptable that a judge knowingly convict a person of a non-existent crime.  Is not this something Hitler and Stalin and other tyrants have done since time immemorial?  Is this the common law that this prestigious court should honor as *stare decisis*?  It, too, like the doctrine of sovereign immunity, is "logically indefensible."  Hallett v. Town of Wrentham, 398 Mass. 550, 558 (1986) (internal cite omitted).

That the majorities of those in the highest court of our land should use a doctrine born out of the womb of a devil court, the Star Chamber, both to defy the public demand for accountability and to defeat article V of the Massachusetts Declaration of Rights, which guarantees us accountability by the judiciary, is unfathomable and shameful, . . . and undoubtedly reflects pejoratively on the courts, even the honorable ones, which unfortunately have written extensively only as parts of the minorities: e.g., The Honorable Justices Brennan, Stevens, Black, Douglas and others.

Curiously, at least two Courts -- Pierson v. Ray, *supra*, and Stump v Sparkman, *supra* – have concluded that:

> . . . we held that this doctrine of judicial immunity was applicable in suits under §1 of the Civil Rights Act of 1871, 42 U.S.C. §1983, for the legislative record gave no indication that Congress intended to abolish this long-established principle.

Stump, 435 U.S. at 356, citing Pierson.

That was a full untruth.  The Congressional Record shows that Congress fully intended that judges would **not** be immune when they deprive people of their civil rights.  Mr. Justice Douglas had traced the legislative history of  §1983 (in Cong. Globe, 42d Cong., 1st Sess.) and confirmed that the congressional intent was to hold judges, as well as every other person, liable for the deprivation of a citizen's civil rights.\[19]/

---

[19]    *Yet despite the repeated fears of its opponents, and the explicit recognition that the section would subject judges to suit, the section remained as it was proposed: it applied to " any person." [2]* **There was no exception for members of the judiciary**. *In light of the sharply contested nature of the issue of judicial immunity it would be reasonable to assume that the judiciary would have been expressly exempted from the wide sweep of the section, if Congress had intended such a result.*

The rationale of the Court is specious on other grounds, too. For instance, a first-year law student is taught that he cannot sue for breach of duty if there is no duty; he cannot sue for breach of contract if there is no contract. Thus, the Court in <u>Pierson</u> had to have known or should have known that Congress did not state that it "intended to abolish judicial immunity" because it had never established judicial immunity. It was men in black robes who brought judicial immunity to our shores in the 19th century. Congress was not at their party! Congress had already had its party: it had decided judges would not be immune to prosecution under §1983. And that section was on the books fully eight months prior to <u>Bradley</u> being decided. Skullduggery might have been afoot. Certainly it had to be an affront to Congress when the Court decided to follow the English courts rather than its own United States Congress!

Granted, the action in <u>Bradley</u> was not brought under any of the Civil Rights Acts" [<u>Pierson,</u> at 549 n. 3 (dissent)], but the debate in Congress regarding judicial immunity was expansive. With the passing of the Act that same year, the Court had to know the majority in Congress were for accountability to stem the tide of personal interests and corruption.

So that statement by the Court in <u>Pierson</u> and acknowledged by the Court in <u>Stump</u> is valueless, hollow. It is a statement made only by a result-oriented court, not an intellectually courageous, principled court. It should hold no weight with this court, which prides itself on thorough and principled opinions. This court should bravely herald that there is no history of a sound rationale in support of judicial immunity.

---

The section's purpose was to provide redress for the deprivation of civil rights. It was recognized that certain members of the judiciary were instruments of oppression and were partially responsible for the wrongs to be remedied. The parade of cases coming to this Court shows that a similar condition now obtains in some of the States. Some state courts have been instruments of suppression of civil rights. The methods may have changed; the means may have become more subtle; but the wrong to be remedied still exists.

<u>Pierson</u>, 386 U.S. at 563 (Douglas, J., dissenting) (emphasis supplied). Mr. Justice Douglas continued expressing his disdain of applying a common-law immunity rule as a defense to liability which Congress had imposed upon

The Court in <u>Pulliam</u>, 466 U.S. at 540, was more honest: it cited the dissenting opinion in

<u>Pierson</u>, at 558-564 for the proposition that "every Member of Congress who spoke to the issue as-

sumed that judges would be liable under §1983." And in <u>Pierson</u> itself, Mr. Justice Douglas wrote

the rationale behind his own understanding:

> The statute [42 U.S.C. §1983], which came on the books as §1 of the Ku Klux Klan Act of
> April 20, 1871, 17 Stat. 13, provides that "every person" who under color of state law or
> custom "subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights,
> privileges, or immunities secured by the Constitution and laws, shall be liable to the party
> injured in an action at law, suit in equity, or other proper proceeding for redress." **To most,
> "every person" would mean every person, not every person except judges.**

<u>Pierson</u>, at 559 (Douglas, J., dissenting).

In sum, What are "rights" if Government can violate them with impunity under the penum-

bra of immunity? Nothing, if redress for their violation is not available. "Rights means *Account-*

*ability of Government* directly to their own people for violations of their own people's rights. That

is the public policy of the United States, *by treaty* and by Constitution." John E. Wolfgram, "How

the Judiciary Stole the Right to Petition," 31 U. West L.A. L. Rev. 12 (Summer 2000). Wolfgram

was referring to *The Universal Declaration of Human Rights,* Gen. Assem. Res. 217, A(III), 10

Dec. 1948, a cornerstone human rights treaty between the United States and the United Nations.

"Its Preamble sets out the important role that government accountability to its own people plays in

international peace: '*Whereas it is essential, if man is not to be compelled to have recourse, as a*

*last resort, to rebellion against tyranny and oppression, that human rights should be protected by*

*the rule of law.*'" Wolfgram, 31 U. West L.A. L. Rev. at 12 n. 19.

**6.** **To deem judges or quasi-judges not persons subject to federal civil rights statutes –
contrary to Congressional intent – would be repugnant to desirable public policy.
And where Defendants Carpenter and Phillips, outside their own Board Rules, vio-
lated Johnson's First Amendment rights, other constitutional civil rights such as her
rights to due process and equal protection, and acted contrary to public policy, the de-
fense of immunity is not available to them, making dismissal inappropriate.**

"any officer or other person," as in <u>Ex parte Virginia</u>, or upon "every person." <u>Id.</u>

Johnson incorporates herein by reference the facts throughout her Complaint and opposition briefs for this proposition. Johnson further states that where the defendants knowingly violated her clearly established rights, the defendants are not entitled to absolute immunity.

> The argument that the actions of public officials must not be subjected to judicial scrutiny because to do so would have an inhibiting effect on their work, is but a more sophisticated manner of saying " The King can do no wrong." [5] Chief Justice Cockburn long ago disposed of the argument that liability would deter judges:

> > "I cannot believe that judges . . . would fail to discharge their duty faithfully and fearlessly according to their oaths and consciences . . . from any fear of exposing themselves to actions at law. **I am persuaded that the number of such actions would be infinitely small and would be easily disposed of.** While, on the other hand, I can easily conceive cases in which judicial opportunity might be so perverted and abused for the purpose of injustice as that, unsound principles, the authors of such wrong ought to be responsible to the parties wronged." Dawkins v. Lord Paulet, L.R. 5 Q. B. 94, 110 (C. J. Cockburn, dissenting).

Pierson, at 564-566 (Douglas, J., dissenting) (emphasis supplied).

"What about the judge who conspires with local law enforcement officers to "railroad" a dissenter?" Justice Douglas asked. Pierson, at 566 (Douglas, J., dissenting). This resonated with Johnson, who contends she was being railroaded because it was easier to cenSURE her professionally than to cenSOR her websites. [Compl. ¶47].

"What about the judge who knowingly turns a trial into a "kangaroo" court?" Id. This, too, resonated with Johnson. [Compl. ¶253, p. 45-46 n. 37]. When SHO Phillips, at the suggestion of BBO Assistant General Carol Wagner, ordered the public from "public trial" in the BBO hearing room, a kangaroo court was being created [Compl. ¶¶185, 238, 185, 187]. This was a reasonable conclusion given that Phillips two-weeks earlier, on 17 November 2003, frequently told the court reporter – when Johnson was speaking -- that the hearing would proceed "off the record" [Compl. ¶134].

"Or one who intentionally flouts the Constitution in order to obtain a conviction?" Id.

Plaintiff's Brief Asserting Neither Quasi-judicial Nor
Quasi-prosecutorial Immunity Is Applicable
Case 1:03-cv-12634-WGY     Document 17     Filed 03/16/2004     Page 25 of 32

Given that the Constitutions – both federal and state – were flouted with abandon during the course of the proceedings of the disciplinary action, this last question by Justice Douglas resonated as the others did.

The negative effect of allowing immunity through §9(3) – or the judicially-created doctrine of judicial immunity and its derivatives -- has encouraged the Board and its staff, members of hearing committees, special hearing officers, the Bar Counsel, and his staff to run amok. They know the respondent attorneys have no recourse against those persons granted immunity. And should the instant case be dismissed, the lesson this court would teach those employed at or associated with the BBO and OBC is that they can continue to disregard not only the BBO rules but also the federal and state constitutions.

> Congress, I think, concluded that the evils of allowing intentional, knowing deprivations of civil rights to go unredressed far outweighed the speculative inhibiting effects which might attend an inquiry into a judicial deprivation of civil rights. [fn6]

Pierson, at 567 (Douglas, J., dissenting).

Where Congress intended justices to be deemed persons, as every other person is, for the purposes of §1983, the defendants here have no immunity, and where absolute judicial immunity was the only basis upon which the defendants sought relief in their SECOND motion to dismiss, both of the defendants' motions must fail in entirety.

**7.    Where "the central purpose of § 1983 is to 'give a remedy to parties deprived of constitutional rights, privileges and immunities by an official's abuse of his position, to extend absolute immunity to any group of state officials is to negate *pro tanto* to the very remedy which it appears Congress sought to create, making the grant of absolute quasi-prosecutorial immunity inappropriate.**

Quasi-prosecutorial immunity "extend[s] unaccountability far beyond where even the Court ever dreamed it would go."\[20]/ By providing government officials any immunity from the gov-

---

**[20]**    Wolfgram, "How the Judiciary Stole the Right to Petition," *supra*, at 16.

erned, the judiciary by fiat makes officials of a government unaccountable to its own people for

abuse of power. This is contrary to chapter 61 of the *Magna Carta*,\[21]/ which grants the "natural"

right to petition for redress of grievances, to complain about and to the government.\[22]/  Most of

all, immunity of any kind usurps substantive just redress, or substantive due process, by denying

the procedural due process right to petition for redress.\[23]/

Congress attempted to address the "[m]isuse of power, possessed by virtue of state law and

made possible only because the wrongdoer is clothed with the authority of state law" [*Imbler*, 424

---

[21]    About eight hundred years ago King John of England and his upper class nobility had a running dispute with the lower nobility, the barons. The barons had the loyalty of most of the common people and that gave them an advantage at the "ballot box" that consisted of mostly swords and bows and arrows. The people siding with the barons gave them the military power to strongly suggest to King John that it would be in his interests to negotiate a bargain on June 15, in the year 1215 AD at Runnymede. The Great King bowed to the will of a people angered at his incursions against common decency. King John agreed to the terms of what is now the cornerstone of both British and American Constitutional Law: The *Magna Carta*.

Wolfgram, at 20.

[22]    <u>Id</u>. at 21 n. 42, citing Corwin, *Constitution of the United States*, 1914 (2d ed. 1964). (The *Magna Carta* is written in Latin and has diverse translations.)

[23]    Historically, "[t]he right to sue and defend in the courts is the alternative of force. In an organized society it is the right conservative of all other rights, and lies at the foundation of orderly government." <u>Chambers v. Baltimore & Ohio R.R.</u>, 207 U.S. 142, 148 (1907). This, too, is derived from the *Magna Carta*. "Chapter 61 guarantees that the King and his heirs shall never interfere with the petitioning process or punish or intimidate anyone for assisting the barons to coerce just redress from the government." Wolfgram, *supra* at 23 n.49.

[The right to petition] is designed to bring government to account under the law of the land, . . . for the violation of other rights. . . . It is intended to subject government to the compulsory process of law *when government does not want to fairly redress the grievance*. It is so important that "law" without it, is "law without justice", and that is another name for oppression.

. . . We in America, whose right of petition is so abridged and burdened by government created immunities from redress and accountability, are on notice of government's intent to progressively and relentlessly oppress us into tyranny.

. . . What we are talking about is the natural and inevitable result of increasing abridgment of petition rights, whether protected by a constitution or not. That's what it means to be a "natural" or "unalienable right."

. . . The reason government abridges it is to allow its officers to violate all other rights with impunity and unaccountability. When government does that, there is only one just and proper response: To throw off such government by any means necessary. That is the bottom line of the "unalienable right of petition for redress."

Wolfgram, "How the Judiciary Stole the Right to Petition," *supra* at 23-24.

U.S. 409, 433 (1976), quoting United States v. Classic, 313 U.S. 299, 326 (1941)] by enacting 42

U.S.C. §1983. Thus "the central purpose of § 1983 is to 'give a remedy to parties deprived of

constitutional rights, privileges and immunities by an official's abuse of his position.'" Imbler, at

433, quoting Monroe v. Pape, 365 U.S. 167, 172 (1961). "It is manifest then," the Court contin-

ued, "that all state officials as a class cannot be immune absolutely from damage suits under 42

U.S.C. §1983 and that to extend absolute immunity to any group of state officials is to negate *pro*

*tanto* the very remedy which it appears Congress sought to create." Imbler, at 433-434, citing

Scheuer v. Rhodes, 416 U.S. 232, 243 (1974).

> Accordingly, we have declined to construe §1983 to extend absolute immunity from dam-
> age suits to a variety of state officials, Wood v. Strickland, 420 U.S. 308 (1975) (school
> board members); Scheuer v. Rhodes, *supra* (various executive officers, including the
> State's chief executive officer); Pierson v. Ray, 386 U.S. 547 (1967) (policemen); **and this
> notwithstanding the fact that, at least with respect to high executive officers, absolute
> immunity from suit for damages would have applied at common law.** Spalding v. Vi-
> las, 161 U.S. 483 (1896); Alzua v. Johnson, 231 U.S. 106 (1913). Instead, we have con-
> strued the statute to extend **only a qualified immunity to these officials**, and they may be
> held liable for unconstitutional conduct absent "good faith." Wood v. Strickland, supra, at
> 315. Any other result would "deny much of the promise of §1983." Id., at 322.

Imbler, 424 U.S. 409, 434 (1976) (Mr. Justice White, with whom Mr. Justice Brennan and Mr. Jus-

tice Marshall join, concurring in the judgment) (Mr. Justice Stevens took no part in the considera-

tion or decision of Imbler.) The Court in Imbler did note the exception for "state legislators " and

"state judges," all of whom had been previously held "to be absolutely immune from liability for

damages under 1983" for their respective legislative and judicial acts. Imbler, at 434-435 (internal

cites omitted).

Where Defendant Bar Counsel Crane, as titular-plaintiff/titular-quasi-prosecuting attorney,

chose to suppress, with the approval of the quasi-administrative adjudicators, exculpatory docu-

ments and preclude witnesses with potentially exculpatory testimony, no immunity can be al-

lowed, even under the majority decision in Imbler.

"As a matter of principle, we perceive no less an infringement of a defendant's **rights** by the knowing use of perjured testimony than by the deliberate withholding of exculpatory information. The **conduct** in either case is reprehensible, warranting criminal prosecution as well as disbarment." Imbler, at 431.\[24]/\[25]/

"[U]nless the threat of suit is also thought to injure the governmental decisionmaking process, the other unfortunate consequences flowing from damage suits against state officials are sufficient only to extend a **qualified immunity** to the official in question." Imbler, 424 U.S. at 437 (White, J., with whom Mr. Justice Brennan and Mr. Justice Marshall joined concurring).\[26]/

---

[24]     MR. JUSTICE WHITE, concurring in the judgment, would distinguish between willful use by a prosecutor of perjured testimony and willful suppression by a prosecutor of exculpatory information. In the former case, MR. JUSTICE WHITE agrees that absolute immunity is appropriate. He thinks, however, that only a qualified immunity is appropriate where information relevant to the defense is "unconstitutionally withheld . . . from the court." Post, at 443.

We do not accept the distinction urged by MR. JUSTICE WHITE for several reasons. As a matter of principle, we perceive no less an infringement of a defendant's rights by the knowing use of perjured testimony than by the deliberate withholding of exculpatory information. The conduct in either case is reprehensible, warranting criminal prosecution as well as disbarment. See *supra*, at 429 nn. 29 and 30.

Imbler, at 431 n.34.

[25]     Mr. Justice disagreed:

that "the knowing use of perjured testimony is as reprehensible as the deliberate suppression of exculpatory evidence. This is beside the point. The reason for permitting suits against prosecutors for suppressing evidence is not that suppression is especially reprehensible but that the only effect on the process of permitting such suits will be a beneficial one -- more information will be disclosed to the court; whereas one of the effects of permitting suits for knowing use of perjured testimony will be detrimental to the process -- prosecutors may withhold questionable but valuable testimony from the court.

Imbler, at 446 n.9 (concurrence footnote).   Seeing no distinction between perjury and suppression, Justice White wrote, "The constitutional obligation of the prosecutor remains utterly unchanged. We would simply not grant him absolute immunity from suits for committing violations of pre-existing constitutional disclosure requirements, if he committed those violations in bad faith." Id.

[26]     Mr. Justice White, addressing the reservation by the majority in footnote 34, wrote at 432-433:

. . . I believe that the Court's opinion may be read as extending to a prosecutor an immunity broader than that to which he was entitled at common law; broader than is necessary to decide this case; and broader than is necessary to protect the judicial process. Most seriously, I disagree with any implication that absolute immunity for prosecutors extends to suits based on claims of unconstitutional suppression of evidence because I believe such a rule

> A prosecutor faced with a decision whether or not to call a witness whom he believes, but whose credibility he knows will be in doubt and whose testimony may be disbelieved by the jury, should be given every incentive to submit that witness' testimony to the crucible of the judicial process so that the factfinder may consider it, after cross-examination, together with the other evidence in the case to determine where the truth lies.

Imbler, 424 U.S. at 440.   In this case, the plaintiff/quasi-prosecutor, Defendant Crane, had the incentive to put witnesses on, but did not, thereby depriving Johnson the opportunity to cross-examine her accusers, the complainants to the BBO/OBC.

> "Absolute privilege has been conceded on obvious grounds of public policy to insure freedom of speech where it is essential that freedom of speech should exist.  It is essential to the ends of justice that **all persons** participating in judicial proceedings . . . should enjoy freedom of speech in the discharge of their public duties **or in pursuing their rights**, without fear of consequences."

Imbler, 424 U.S. at 440 (internal cite omitted) (emphasis supplied).  Defendant Bar Counsel Crane brought a Petition for Discipline against Johnson [Compl. ¶13].   Over half of the exhibits are pages from Johnson's website, leading to the reasonable conclusion that Crane's primary purpose is to silence Johnson by intimidation and to punish her for enjoying her right to speak freely and express her political views.  The second of the three counts consists of a *de minimus* fee dispute. The third is for Johnson's alleged contempt of a non-existent order.\[27]/

> I concur in the judgment in this case. However, insofar as the majority's opinion implies an absolute immunity from suits for constitutional  violations other than those based on the prosecutor's  decision to initiate proceedings or his actions in  bringing information or argument to the court, I disagree.  Most particularly I disagree with any implication that the absolute immunity extends to suits charging unconstitutional suppression of evidence. Brady v.  Maryland, 373 U.S. 83 (1963).

Imbler, 424 U.S. at 441 (concurrence).

---

would threaten to injure the judicial process and to interfere with Congress' purpose in enacting 42 U.S.C.1983, without any support in statutory language or history.

[27]   Johnson was doing discovery on a "whistleblower" type case.   In 1994-1995, she was looking for more evidence of fraud by an environmental company on major government projects, such as the Big Dig. Tyco International, whose CEO, Dennis Koznowski, was recently tried for "removing" $600 million from Tyco's coffers, took over the company in 1995.  Koznowski's lawyer repeatedly asked the court to jail Johnson.  The court did . . . on 17 December 1998.  This is some of the evidence precluded by the BBO.

> Immunity from a suit based upon a claim that the prosecutor suppressed or withheld evidence would discourage precisely the disclosure of evidence sought to be encouraged by the rule granting prosecutors immunity from defamation suits. Denial of immunity for unconstitutional withholding of evidence would encourage such disclosure. A prosecutor seeking to protect himself from liability for failure to disclose evidence may be induced to disclose more than is required. But, this will hardly injure the judicial process.*fn8 Indeed, it will help it. Accordingly, lower courts have held that unconstitutional suppression of exculpatory evidence is beyond the scope of "duties constituting an integral part of the judicial process" and have refused to extend absolute immunity to suits based on such claims.

Imbler, 424 U.S. at 443 and cases gathered.

> Equally important, unlike constitutional violations committed in the courtroom -- improper summations, introduction of hearsay evidence in violation of the Confrontation Clause, knowing presentation of false testimony . . . the judicial process has no way to prevent or correct the constitutional violation of suppressing evidence. The judicial process will by definition be ignorant of the violation when it occurs; and it is reasonable to suspect that most such violations never surface. It is all the more important, then, to deter such violations by permitting damage actions under 42U.S.C. § 1983 to be maintained in instances where violations do surface.

Imbler, 424 U.S. at 443-444, and cases gathered.  To suppress evidence is exactly what OBC Bar

Counsel Crane moved Defendants Chair Carpenter and SHO Phillips to do.  [Compl. Exh., pas-

sim].  They used the Administrative Practice Act as an excuse for being able:

**(a)** to suppress evidence,

**(b)** to deny Johnson the opportunity to confront the complainants,

**(c)** to use only hearsay evidence against Johnson [Crawford v. Washington, -- U.S. --, No. 02-9410 (March 2, 2004) (holding that where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is confrontation, and thus overturning Ohio v. Roberts, 448 U.S. 56 (1980), which allowed a hearsay witness statement if a judge found it trustworthy)],\[28]/ and

**(d)** to preclude Johnson from offering evidence – testimonial or documentary.

"It is apparent that the injury to a defendant which can be caused by an unconstitutional

suppression of exculpatory evidence is substantial, particularly if the evidence is never uncovered."

---

[28]     A 9-0 opinion potentially disallows hearsay evidence that courts had increasingly allowed as exceptions during the past 25 years and boldly reinforces a defendant's right to confront witnesses under the Sixth Amendment of the U.S. Constitution.

Imbler, at 444.  This latter scenario, too, contributed significantly to the deficient administrative

process at the BBO/OBC [Compl. ¶140, Compl. Figure 3].

Johnson had documentary evidence of a fabricated document [Compl. Figure 2a-2e at

¶116]; she subpoenaed one of the contributors to that fabricated evidence to trial; he arrived at the

trial pursuant to Johnson's subpoena; Defendant Phillips told him the lawful subpoena was invalid

and excused him as a witness [Compl. ¶179].

> . . .  The procedural difference between the absolute and the qualified immunities is impor-
> tant. An absolute immunity defeats a suit at the outset, so long as the official's actions were
> within the scope of the immunity.  **The fate of an official with qualified immunity de-**
> **pends upon the circumstances and motivations of his actions, as established by the**
> **evidence at trial.** See Scheuer v.  Rhodes, 416 U.S. 232, 238-239 (1974); Wood v. Strick-
> land, 420 U.S. 308, 320-322 (1975).

Imbler, at 419 n. 13 (emphasis supplied).

> … Out of concern for the integrity of the judicial system, the Supreme Court in Imbler thus
> extended absolute immunity to those prosecutorial activities "intimately associated with the
> judicial phase of the criminal process," such as initiating a prosecution or presenting the
> State's case.  [Imbler], at 430, 96 S.Ct. at 994.  It specifically left unanswered the question
> whether prosecutorial activity which is not closely associated with the trial process, **such as**
> **certain administrative or investigative conduct**, might warrant only a qualified immu-
> nity.

Chicopee Lions Club v. District Atty. for Hampden Dist., 396 Mass. 244, 248 (1985) (emphasis

supplied).  In the BBO action, Crane was the titular plaintiff and titular quasi-prosecuting attorney.

Strauss-Weisberg was the quasi-prosecuting attorney, and is not a defendant in the case at bar.

+-----------------------------------------------------------------+
|                          **NOTE**                               |
|                                                                 |
|      Johnson incorporates herein by reference the arguments in her |
|         Opposition to Defendants' Further Motion to Dismiss     |
+-----------------------------------------------------------------+

WHEREFORE, Plaintiff prays this court deny the defenses of quasi-judicial and quasi-

prosecutorial immunity in the interest of justice.

Respectfully submitted,
Plaintiff Barbara C. Johnson, pro se,

/s/ Barbara C. Johnson  <barbaracjohnson@worldnet.att.net>
16 March 2004                    Barbara C. Johnson, Esq., Pro Se
6 Appletree Lane
Andover, MA 01810-4102
978-474-0833
BBO #549972

## AFFIDAVIT OF BARBARA C. JOHNSON

I, Barbara C. Johnson, hereby swear and say that all the statements and observations I attribute to myself in the within pleading are true and accurate.   Sworn under the pains and penalties of perjury.

/s/ Barbara C. Johnson <barbaracjohnson@worldnet.att.net>
16 March 2004                    Barbara C. Johnson, Esq., Pro Se

## PLAINTIFF'S CERTIFICATION PURSUANT TO LOCAL RULE 7.1(A)(2)

I, Barbara C. Johnson, hereby certify, pursuant to Local Rule 7.1(A)(2), that I did not confer with AAG John Hitt because this brief was allowed by the court in its order of 25 February 2004.  There was no need to "narrow" the issues.

/s/ Barbara C. Johnson  <barbaracjohnson@worldnet.att.net>
16 March 2004                    Barbara C. Johnson, Esq.